UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MARTIN J. WALSH,
SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF LABOR,

    Plaintiff,

v.                     Case No. 8:21-cv-217-VMC-AEP

FREEMAN SECURITY SERVICES,
INC., and DARREN FREEMAN,

    Defendants.
_____/

## ORDER

     This matter comes before the Court upon consideration of Defendants Freeman Security Services, Inc., and Darren Freeman's Motion for Summary Judgment, filed on September 17, 2021. (Doc. # 54). Plaintiff, the United States Secretary of Labor, responded on October 8, 2021, and Defendants replied on October 22, 2021. (Doc. # 56; Doc. # 57). The Secretary also responded to the Court's January 10, 2022, Order for supplemental briefing on January 14, 2022 (Doc. # 62; Doc. # 65). Defendants then filed a Motion to Strike Plaintiff's Attachments to Plaintiff's Supplemental Brief on January 31, 2022. (Doc. # 67). The Secretary replied on February 9, 2022.

(Doc. # 69). For the reasons that follow, both Motions are denied.

I.   **Background**

A.   **FSS General Operations**

Freeman Security Services, Inc. ("FSS") provides licensed armed and unarmed security services for Florida businesses. (Doc. # 54-2 at ¶¶ 5, 8). The security firm was founded in January 2008 by CEO and president Darren Freeman. (Id. at ¶ 2). His son Brian Freeman became the vice president in December 2020. (Id. at ¶ 3). Darren and Brian Freeman are FSS's sole corporate officers and have exclusive hiring and firing authority over their guards. (Doc. # 54-3 at 21:24-22:14). Since 2016, FSS also employed up to three administrative employees, who assisted with scheduling, payroll, and other administrative tasks. (Doc. # 54-3 at 35:20-37:16; Doc. # 54-4 at 1-2). FSS operates entirely within the State of Florida, and the bulk of their business is in the Central Florida area. (Doc. # 54-2 at ¶¶ 5-7).

FSS solicits Florida businesses that are interested in having licensed private security guards stationed on their premises. (Id. at ¶ 5). Clients contract directly with FSS for the times, locations, and scope of services to be rendered at their premises. (Doc. # 54-4 at 7-8). Clients pay FSS for

2

the guards' services, and the guards negotiate with FSS for an hourly rate based on the contract between FSS and the client. (Id. at 8).

FSS then provides clients with licensed private security guards that are contracted with FSS. (Id.). FSS security guards must have a private security license issued by the State of Florida before they can claim a shift for an FSS client. (Id.). Prospective guards must also sign an "Independent Contract Agreement," which contains non-solicitation, non-recruit, and non-competition clauses. (Id.; Doc. # 54-3 at 106-07). The agreement contemplates renewable three-month terms. (Doc. # 54-3 at 108). Defendants' summary of hours shows that while many guards worked sporadically, others worked for FSS for over a year. See generally (Doc. # 47-1, 47-2, 47-3).

**B.   <u>FSS Security Guards</u>**

The guards' work "generally consisted of unspecialized tasks such as walking or driving around the post's grounds, checking gates, checking in guests, monitoring cameras, and filling in reports." (Doc. # 56-2 at ¶ 17). Guards are required to wear uniforms that display the FSS logo, which can only be rented through FSS. (Doc. # 54-3 at 25:10-26:22). On occasion, FSS would provide guards with vehicles and

3

reimburse them for gas used in their personal vehicles. (Doc. # 56-2 at ¶ 16; Doc. # 65-2). The guards can use their own vehicles, firearms, and other security tools if they wish, although FSS does not provide firearms. (Doc. # 54-3 at 24:5-14). FSS also rents other items to the guards, such as utility belts and hats. (Id. at 24:15-20).

Once on site, the client assigns tasks to the attending guards. (Doc. # 54-4 at 7-8). Brian Freeman, or administrative employees Kevin Lefebvre or Jeff Johnson, would occasionally visit client sites for "quality assurance," where they would confirm that FSS guards were present and awake at their posts. (Doc. # 54-3 at 35:20-38:4). Clients who are dissatisfied with a guard's performance can report their complaints to FSS, who then decides whether to terminate or discipline the guard. (Doc. # 54-4 at 9-10).

The parties offer competing accounts of how the guards are trained and scheduled to work. Defendants assert that FSS relies on the training each guard obtains from securing their Florida security licenses; FSS does not provide them with further training. (Doc. # 54-3 at 30:13-33:3). The Secretary counters that Defendants employed certain individuals to "train[] new security guards on the responsibilities required by their post[s]," and that these individuals had supervisory

4

titles, such as Sergeant, Captain, and Chief of Operation. (Doc. # 56-2 at ¶ 14).

With respect to scheduling, Defendants suggest that the guards have "ultimate authority" over their schedules, in that they decide if, when, and where to work based on available shifts. (Doc. # 54-4 at 8). Guards provide FSS with their availability and can choose whether to accept or decline an available shift with an FSS client. (Id.).

The Secretary, however, proffers that the guards could not "provide input for, negotiate, or change" the weekly schedules created by FSS. (Doc. # 56-2 at ¶ 5). Once assigned to a shift, guards could not request to be removed from the shift or ask to leave the shift early. (Id. at ¶ 6). Other guards were instructed to work during times that they requested off, and others were occasionally instructed to stay at their posts after their shift until a relief guard arrived to take over. (Id.). This would result in guards having "to work a double shift, [] at times up to 20 hours with no advance knowledge." (Id.).

C.   **State and Federal Audits**

Darren Freeman admits that FSS does not pay their security guards overtime wages because they classify the guards as independent contractors. (Doc. # 54-3 at 66:6-

5

67:7). Defendants classify the guards as independent contractors based on (1) a tax audit from the Florida Department of Revenue, (2) conversations that took place in 2015 with United States Wage and Hour Division ("WHD") representative Meredith Meadows, and (3) the terms of the Independent Contractor Agreement. (Doc. # 54-4 at 4-6).

Sometime before this suit was filed, FSS was audited by the Florida Department of Revenue for the years 2015 and 2016. (Id. at 5). Darren Freeman testified that the Department of Revenue informed him that the guards were independent contractors in the eyes of Florida tax law. (Doc. # 54-3 at 67:16-24). In 2015, Darren Freeman also contacted the WHD in an effort to confirm FSS's compliance with the FLSA. (Id. at 70:2-8). WHD representative Meredith Meadows informed Darren Freeman that "the way that FSS conducted business with the security officers rendered them independent contractors rather than employees." (Id. at 5).

Sometime in 2018, the WHD launched its first FLSA compliance investigation into FSS. (Doc. # 54-3 at 12:7-16). This investigation evaluated FSS's compliance with the FLSA for the period spanning from July 30, 2016, to July 30, 2018. (Id.). The WHD concluded that the FSS security guards should have been classified as employees for purposes of the FLSA.

(Id. at 80:18-81:6). While he disagreed that FSS violated the FLSA, Darren Freeman signed an agreement promising to pay overtime premiums for certain security guards. (Id. at 80:25-81:6, 84:10-16). After this first investigation, FSS changed the duration of Independent Contractor Agreement to three months and added a condition that the guards would bear the costs of alternative dispute resolution. (Id. at 94:2-19).

### D.    **The Instant Action**

On August 28, 2019, WHD Investigator Carmen Rodriguez began the second WHD investigation to determine whether FSS had since brought itself into compliance with the FLSA. (Doc. # 56-2 at ¶ 3). This investigation covered the period of August 2, 2018, to December 25, 2019. (Id.). After interviewing FSS security guards, Investigator Rodriguez concluded that Defendants failed to pay the guards overtime premiums even after the first WHD investigation concluded. (Id. at ¶ 12).

The Secretary initiated this action on January 28, 2021, against FSS and Darren Freeman individually. (Doc. # 1). Therein, the Secretary alleges that Defendants did not pay its employees the applicable federal minimum wage, nor did they pay overtime premiums for eligible workers. (Id. at ¶ 4). The Secretary alleges that these continued violations

were willful in light of Darren Freeman's prior admission of violating the FLSA. (Id. at 3).

Defendants filed the instant Motion for Summary Judgment, the Secretary responded, and Defendants replied in turn. (Doc. ## 54, 56, 57). On January 12, 2022, the Court also ordered the Secretary to file a supplemental brief discussing the guards' qualification for enterprise coverage. (Doc. # 62). The Secretary did so on January 18, 2022. (Doc. # 65). Defendants then moved to strike the exhibits attached to the supplemental briefing on January 31, 2022.(Doc. # 97). The Secretary responded on February 9, 2022. (Doc. # 69). Accordingly, both Motions are ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving

party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference

from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

### A.   <u>WHD Investigator Declarations</u>

At the outset, the Court must address the declarations of WHD Investigator Carmen Rodriguez, which the Secretary filed with its summary judgment response and supplemental brief. The declarations summarize Investigator Rodriguez's factual findings and conclusions, which are derived from her interviews with FSS security guards. (Doc. # 56-2; Doc. # 65-4). Accordingly, Defendants argue that Investigator Rodriguez's declarations are hearsay that cannot be used to rebut their Statement of Material Facts. (Doc. # 57 at 8; Doc. # 67 at 5).

The Court is permitted to consider hearsay statements at the summary judgment phase when the statements "could be reduced to admissible evidence at trial or reduced to

10

admissible form." <u>Jones v. UPS Ground Freight</u>, 683 F.3d 1283, 1294 (11th Cir. 2012) (internal citations omitted). Another court has explained the practical implications of relying on a WHD investigator's declaration at the summary judgment stage:

> Although this evidence is not currently admissible because the Court has found it to be hearsay under Rule 801, this evidence references witnesses who may personally testify at trial as to these allegations. Therefore, the Court cannot grant judgment as a matter of law. The Court cautions, Plaintiff, however, that to prevail at trial, it must come forward with admissible evidence to prove its claims and cannot rely solely on Huggins's, or any other Wage and Hour investigator's testimony, as to what Defendants' employees stated.

<u>Solis v. La Familia Corp.</u>, No. 10-CV-2400-EFM-GLR, 2013 WL 589613, at *6 (D. Kan. Feb. 14, 2013).

Here, the facts Investigator Rodriguez learned from the security guards can be reduced to admissible evidence at trial through the guards' own testimony. While the Court will consider the facts from the declarations at this stage, the Secretary "must come forward with admissible evidence to prove its claims [at trial] and cannot rely solely on [Investigator Rodriguez's], or any other Wage and Hour investigator's testimony, as to what Defendants' employees stated." <u>Id.</u>

**B.    <u>Motion to Strike Supplemental Brief</u>**

Defendants also move to strike the exhibits to the Secretary's supplemental brief. (Doc. # 67). The Court directed the Secretary to file a supplemental brief, not to exceed seven pages, on the issue of enterprise coverage. (Doc. # 62). The Secretary included an additional twelve pages of supporting exhibits with its supplemental brief. (Doc. ## 65-1, 65-2, 65-3, 65-4). Defendants argue that these unauthorized exhibits exceed the Court's supplemental briefing order, constitute inadmissible hearsay, are untimely, and ultimately fail to fend off summary judgment issues. (Doc. # 67 at 2).

Rule 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Hooker v. Sec'y, Dep't of Veterans Affairs, No. 8:18-cv-2000-CEH-JSS, 2019 WL 12493574, at *1 (M.D. Fla. July 24, 2019) (internal citations omitted). The rule only applies to pleadings, not to motions or responses in opposition. Id. "Numerous courts in the Eleventh Circuit have held that a motion to strike a filing that is not a pleading as defined by Rule 7(a) is improper." Kahama VI, LLC v. HJH, LLC, No. 8:11-cv-2029-JSM-TBM, 2014 WL 3721298, at *1 (M.D. Fla. July 28, 2014) (collecting cases).

This Motion is procedurally improper because it targets exhibits to a supplemental brief — not a pleading. Id. Nonetheless, Defendants have not adequately explained how they may have been prejudiced by these exhibits. The exhibits show where FSS's own uniforms were manufactured (Doc. # 65-3), a fact that was surely known to Defendants before moving for summary judgment. The declaration of FSS security guard Daniel Navarrete also merely provided supplemental information suggesting where his cell phone and work vehicle were manufactured. (Doc. # 65-2 at ¶¶ 3-4). These exhibits were produced in response to the Court's supplemental briefing order to allow the Court to better rule on the merits on the case. (Doc. # 57 at 1-3). Thus, Defendants' Motion to Strike is denied.

### C.   **FLSA Enterprise Coverage**

The FLSA provides coverage where an enterprise (1) "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person;" and (2) "whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i)-(ii). "It has been firmly established that the phrase 'engaged in

commerce' within the meaning of the FLSA is to be given a broad, liberal construction." DeMaria v. Ryan P. Relocator Co., 512 F. Supp. 2d 1249, 1257 (S.D. Fla. 2007)(citing Brennan v. Wilson Bldg., Inc., 478 F.2d 1090, 1093 (5th Cir. 1973)). FSS concedes that it grossed over $500,000 in sales over the applicable time periods. (Doc. # 54 at 9).

Defendants nevertheless argue that they are entitled to summary judgment because their security guards are independent contractors who do not qualify for enterprise coverage under the FLSA. (Doc. # 54 at 9). The Secretary asserts that the guards are economically dependent upon FSS and that the guards have sufficiently engaged in interstate commerce to invoke enterprise coverage. (Doc. # 56 at 8-10). As discussed in greater depth below, the Court finds that the security guards are employees for the purposes of the FLSA. The issue at this stage is whether the guards qualify for enterprise coverage. The Court finds that they do under the FLSA's handling clause.

Coverage under the handling clause exists where "the goods or materials [the workers] handled had previously come into the state from elsewhere." Molina-Aranda v. Black Magic Enter., L.L.C., 983 F.3d 779, 787 (5th Cir. 2020). From a plain reading of the statutory text, the Eleventh Circuit has

14

explained that workers must merely show that the goods or materials they handled moved in interstate commerce:

> So, if a district court, ruling for a[n] [employer], applied the "coming to rest" doctrine — for instance, by looking at where [the employer] bought an item instead of where an item was produced, we must vacate the judgment for the [employer] if there is a question about where the "goods" or "materials" were produced or where they have moved. The district courts will need to make some further decisions about the interstate history of the items in these cases.

Polycarpe v. E&S Landscaping Serv., Inc., 616 F.3d 1217, 1221 (11th Cir. 2010). Under the handling clause, the employees' work does not need to directly affect interstate commerce. See Molina-Aranda, 983 F.3d at 787 ("Plaintiffs here do not need to allege that their actual work activities directly affected interstate commerce, merely that the goods or materials they handled had previously come into the state from elsewhere." (internal citations omitted)).

As such, enterprise coverage under the handling clause can be established by providing evidence that goods or materials handled by employees were produced outside the forum state. See Smith v. Metro Sec., Inc., No. 18-953, 2019 WL 6701311, at *8 (E.D. La. Dec. 9, 2019) (permitting a reasonable inference that vehicles, fuel, firearms, and ammunition produced outside Louisiana had moved in interstate

15

commerce); Castro v. Sevilla Props., LLC, No. 13-22466-CIV, 2013 WL 6858398, at *5 (S.D. Fla. Dec. 30, 2013) (finding a reasonable inference that security guard's flashlight, cell phone, and uniform moved in interstate commerce). For purposes of the FLSA, "materials" include "tools or other articles used in a business's commercial operations that have a significant connection to those operations." Polycarpe, 616 F.3d at 1225-26.

Here, the Secretary has produced such evidence. For instance, security guard Daniel Navarrete attested that FSS provided him with a Dodge Charger to use when patrolling client sites. (Doc. # 65-2 at ¶¶ 2-3). He also used his personal Samsung Galaxy S7 cell phone to communicate with supervisors, communicate with FSS clients, and to transmit photographs of his timesheets to FSS for payroll. (Id. at ¶¶ 3-4). Investigator Rodriguez confirmed that the guards routinely used their personal cell phones to transmit their timesheets. (Doc. # 56-2 at ¶ 11).

FSS security personnel were also _required_ to wear uniforms that could only be rented from the company. (Doc. # 54-4 at 8-9) (emphasis). The manufacturing tags on the uniforms read "Made in China" and "Made in El-Salvador." (Doc. # 65-3 at 1-3). Investigator Rodriguez also found that FSS

16

provided some guards with company vehicles and would reimburse employees for gas used in their personal vehicles while on patrol. (Doc. # 56-2 at ¶ 16).

These uniforms, vehicles, fuel, and cell phones have a significant connection to the guards' security work. The uniforms distinguished security personnel from civilians, the vehicles and fuel were useful for patrolling client sites, and the cell phones were necessary for guards to communicate with FSS supervisors and clients.

The manufacturing tags on the uniforms create a reasonable inference that the guards' uniforms traveled through interstate commerce. Daniel Navarrete's Samsung Galaxy S7 cell phone and the FSS Dodge Charger create the same inference as the Secretary has provided documentation suggesting that both the cell phone and the Dodge Charger were manufactured outside the State of Florida. (Doc. # 65 at 3-4). The uniforms, cell phone, and vehicle all provide a reasonable inference that (1) FSS security guards handled materials necessary to perform their job functions and (2) those materials had moved through interstate commerce. Thus, summary judgment must be denied because the Secretary has produced evidence from which a reasonable factfinder could determine that enterprise coverage exists.

D.   **Employment Relationship**

The FLSA broadly defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Whether a worker is an employee under the FLSA is a question of law to be answered by the trial court. Antenor v. D & S Farms, 88 F.3d 925, 929 (11th Cir. 1996). To determine whether an employer-employee relationship exists, "courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence." Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1311 (11th Cir. 2013).

The Eleventh Circuit looks to six factors in considering the economic reality of an employment relationship:

> (1) The nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the alleged employer's business.

Scantland, 721 F.3d at 1311-12. No single factor is dispositive, and the list is not exhaustive. Id. at 1312 n.2 (citing Santelices v. Cable Wiring, 147 F. Supp. 2d 1313,

18

1319 (S.D. Fla. 2001)). Further, "the label the parties put on the relationship is not determinative, nor is it relevant whether the parties intended to create an employment relationship." Sakacsi v. Quicksilver Delivery Sys., Inc., No. 8:06-cv-1297-SCB-MAP, 2007 WL 4218984, at *3 (M.D. Fla. Nov. 28, 2007).

While the Eleventh Circuit has yet to specifically consider the employment relationship between a security firm and their guards, the Court finds guidance from the Circuits that have. The Sixth and Fourth Circuits, applying the same economic reality test described above, have both found that security guards were employees of their respective security firms. See Acosta v. Off Duty Police Servs., Inc., 915 F.3d 1050, 1055 (6th Cir. 2019) (affirming trial court's finding that security guards were employees of their security firm); Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 309 (4th Cir. 2006) (holding that security guards tasked with guarding Saudi royal family members were employees under the FLSA). The Court next addresses each factor of the economic reality test.

### 1.  **Control**

The first factor in the economic reality test is "the nature and degree of the alleged employer's control as to the

manner in which the work is to be performed." Scantland, 721 F.3d at 1312. The Eleventh Circuit has found the following factors, among others, relevant to the control inquiry: "whether the alleged employer (1) had the power to hire and fire the employee, (2) supervised and controlled employee work schedules and conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Villarreal v. Woodham, 113 F.3d 202, 205 (11th Cir. 1997). The Court has also found in favor of economic dependence where an alleged employer exclusively controls customer volume. See Schofield v. Gold Club Tampa, Inc., No. 8:19-cv-3097-VMC-TGW, 2021 WL 533540, at *6 (M.D. Fla. Feb. 12, 2021) (finding exotic dancer to be a club employee in part due to the club's exclusive control over advertising and customer solicitation).

Here, it is undisputed that FSS has the exclusive authority to solicit clients and that the volume of claimable work was entirely facilitated by FSS. (Doc. # 54-4 at 7-8). Darren and Brian Freeman also had exclusive hiring and firing authority over the guards. (Doc. # 54-3 at 21:24-22:14). The guards could negotiate their hourly rates with FSS every three months, but FSS had the ultimate authority to approve or reject a guard's requested rate. (Id. at 55:22-56:9; Doc. #

54-4 at 8). Further, the Independent Contractor Agreement includes non-solicitation, non-recruit, and non-compete clauses, which restrict the guards' ability to seek future work that may conflict with FSS's interests. (Doc. # 54-3 at 106-107). And of course, the guards are required to wear a uniform bearing an FSS insignia while stationed at a client site. (Doc. # 56-2 at ¶ 15). This control over customer volume, the guards' ultimate pay rates, the guards' attire, and the guards' economic opportunity after leaving FSS weigh in favor of employee status.

Nonetheless, Defendants argue that the lack of jobsite supervision warrants classifying the guards as independent contractors. Investigator Rodriguez noted that security guards generally walk or drive around a given site, check in guests, monitor cameras, and complete reports. (Id. at ¶ 17). This sort of routine work requires a minimal degree of supervision, and thus does not transform the guards into independent contractors. See Acosta, 915 F.3d at 1061 ("The routine traffic and security work performed by ODPS's sworn officers, which often involved sitting in a car for hours at a time, did not require more than periodic supervision.").

Thus, while Defendants admit that they do not closely monitor the guards, the guards are not engaged in work that

necessarily warrants close supervision. The first factor favors economic dependence.

## 2. **Opportunity for Profit or Loss**

The second factor is "the alleged employee's opportunity for profit or loss depending upon [her] managerial skill." Scantland, 721 F.3d at 1312. "Courts may find independent contractor status when a worker is able to garner additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work." Maldonado v. Callahan's Express Delivery, Inc., No. 8:13-cv-292-VMC-AEP, 2018 WL 398724, at *5 (M.D. Fla. Jan. 12, 2018) (citing Scantland, 721 F.3d at 1316-17).

The security guards' work is time oriented, not project oriented. (Doc. # 56-2 at ¶ 17 ("The guards' work generally consisted of unspecialized tasks such as walking or driving around the post's grounds, checking gates, checking in guests, monitoring cameras, and filling in reports.")). Their earnings are strictly tied to the hours they worked, and there is no evidence they could earn more by exercising initiative, judgment, or foresight. See Acosta, 915. F.3d at 1059 ("ODPS's assignments required workers to be present for set periods of time, regardless of what skills they exercised, so workers

22

could not complete jobs more or less efficiently than their counterparts.").

This factor strongly favors employee status since the guards' payment is dependent on "customer demand, not the worker's skill." Walsh v. EM Protective Servs. LLC, No. 3:19-CV-00700, 2021 WL 3490040, at *8 (M.D. Tenn. Aug. 9, 2021).

### 3. Relative Investments of the Parties

The third factor in the economic reality test is "the alleged employee's investment in equipment or materials required for [her] task." Scantland, 721 F.3d at 1312.

The facts before the Court do not favor either classification. For instance, guards were required to wear FSS uniforms, but the guards had to pay to rent them from FSS directly. (Doc. # 54-3 at 26:7-22). Defendants would occasionally gas reimburse to guards used their own vehicles to patrol client sites, Defendants on occasion would reimburse them for gas. (Doc. # 56-2 at ¶ 16). Defendants also allowed their security personnel to bring their own firearms at their own expense. (Doc. # 54-4 at 9). Further, the security guards used their personal cell phones to transmit photographs of their timesheets to FSS. (Doc. # 56-2 at ¶ 11).

Defendants argue that the guards' investment in their Florida security licenses and rental uniform support classifying them as independent contractors. (Doc. # 54 at 16–17). But investment in a private security license is immaterial because all private security guards must be licensed with the State of Florida regardless of their employment status. Fla. Stat. § 493.6301, et seq.; Schultz, 466 F.3d at 308 ("Licensing is required of all persons working as personal protection specialists in Virginia regardless of whether they are employees or independent contractors."). This factor does not favor either classification.

### 4.  Special Skill Required to Perform the Job

The fourth factor is "whether the service rendered requires a special skill." Scantland, 721 F.3d at 1312. Other courts have found that security guards do not employ special skills or training in the course of their work. See Schultz, 466 F.3d at 308 (noting that although licensed protection agents could provide specialized services, the agents' duties to make hourly patrol walks and escorting contractors throughout a property were largely unspecialized); Solis v. Int'l Detective & Protective Serv., Ltd., 819 F. Supp. 2d 740, 752 (N.D. Ill. 2011) (noting that "monitoring client worksites involved normal, unspecialized" work").

24

Here, the guards patrol clients' properties, screen incoming and outgoing civilians, monitor security cameras, and fill out reports. (Doc. # 56-2 at ¶ 17). This work does not require a specialized degree of skill, which ultimately favors employee status.

### 5. Permanency and Duration of Relationship

Fifth, the Court considers "the degree of permanency and duration of the working relationship." Scantland, 721 F.3d at 1312. The facts here also do not favor one classification over the other. Defendants suggest that some guards have renewed their three-month agreements several times, but also argue that the vast majority of the 195 guards who worked for FSS since August 2018 worked for a few months or less. (Doc. # 54 at 20-21). The Secretary counters that the guards who left FSS would have stayed if they were properly paid overtime premiums. (Doc. # 56 at 17; Doc. # 56-2 at ¶ 19). At this stage, this factor does not favor either status.

### 6. Integral Services

The sixth and final factor is "the extent to which the service rendered is an integral part of the alleged employer's business." Scantland, 721 F.3d at 1312. Mr. Freeman formed FSS to furnish security services to clients throughout Central Florida. (Doc. # 54-2 at ¶¶ 2, 8). Realistically, FSS

25

could not provide its clients with private security without having dispatchable security personnel. See Acosta, 915 F.3d at 1055 ("As its name implies, [Off Duty Police Services, Inc.] built its business around the security and traffic control services provided by its workers."; Schultz, 466 F.3d at 309 (finding security guards were integral to a business where company "was formed specifically for the purpose of supplying" private security). This factor weighs in favor of classifying FSS security guards as employees.

### 7.  Examining the Record as a Whole

In determining whether an employer-employee relationship existed, "[n]o one factor is determinative" and "each factor should be given weight according to how much light it sheds on the nature of the economic dependence of the putative employee on the employer." Maldonado, 2018 WL 398724, at *7. The weight of these factors must be balanced in light of the FLSA's "strikingly broad" definition of "employee." Keller v. Miri Microsystems LLC, 781 F.3d 799, 804 (6th Cir. 2015).

Here, four of the six Scantland factors support the conclusion that security guards were FSS employees while the remaining factors do not affirmatively favor either status. The economic reality is that FSS security guards were entirely

dependent on FSS for their economic opportunity. FSS controlled the volume of available client work for guards to claim, the guards' economic opportunity was strictly tied to their hours worked, the guards' work was unspecialized, and the guards performed an integral service to FSS's business. The totality of the circumstances leads this Court to conclude that the guards were employees under the FLSA.

### E.    **Willfulness**

Lastly, Defendants contend that the Secretary cannot prove that any alleged FLSA violations were willful. (Doc. # 54 at 21). Willfulness is established when a defendant "knew or showed a reckless disregard for the matter of whether its conduct was prohibited by the FLSA." McGuire v. Hillsborough Cnty., FL, 511 F. Supp. 2d 1211, 1218 (M.D. Fla. 2007) (citing McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 135 (1988)). Ultimately, "[t]he inquiry into willfulness is heavily fact-driven . . . and requires a state of mind determination." Moreno v. United States, 82 Fed. Cl. 387, 397 (2008) (internal citations omitted). Id.

Defendants insist that their reliance on guidance from state and federal agencies nullifies any suggestion of willfulness. (Doc. # 54 at 21-23). The Secretary argues that any violations were willful because Defendants admitted to

violating the FLSA at the conclusion of the first WHD investigation, which took place several years after Defendants spoke with WHD representative Meredith Meadows. (Doc. # 56 at 18-19). Further, the Secretary offers that the Florida Department of Revenue's classification of the guards has no bearing on whether they are employees under the FLSA. (Id. at 19). Whether Defendants willfully violated the FLSA is heavily-fact driven and requires the Court to "explore the state of mind of the decision makers" in this case. Moreno, 82 Fed. Cl. at 398. Because Defendants' state of mind must be explored, the Court "must have an opportunity to assess the credibility of those testifying about that state of mind." Id. Summary judgment on the issue of willfulness is denied.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendants Freeman Security Services, Inc., and Darren Freeman's Motion for Summary Judgment (Doc. # 54) is **DENIED.**

(2)  Defendants' Motion to Strike Plaintiff's Attachments to Plaintiff's Supplemental Brief (Doc. # 67) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 14th day of February, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE